ROSEMARY LEDET, Judge.
Lin this is a criminal appeal, the defendant, Annie Brown, appeals her convictions of three counts of attempted cruelty to a juvenile and her sentences. For the reasons that follow, we affirm.

STATEMENT OF THE CASE

On October 20, 2010, Ms. Brown was charged with three counts of cruelty to a juvenile in violation of La. R.S. 14:93. Ms. Brown pled not guilty at her arraignment. On February 7, 2011, a preliminary hearing was held; and the district court found probable causé. On July 5, 2011, Ms. Brown waived her right to trial by jury, and trial commenced. The district court found Ms. Brown guilty of attempted cruelty to a juvenile on all three counts. On January 6, 2012, the district court sentenced Ms. Brown to five years of imprisonment on each count, suspended the sentences, and placed Ms. Brown on five years active probation. This appeal followed.

*2
STATEMENT OF THE FACTS

Un 2007, Ms. Brown’s sister, Betty-Brown, died of complications during childbirth. Sometime thereafter, Ms. Brown took four of her deceased sister’s children to live with her — one girl and three boys. The three boys are the alleged victims— DM, aged five at the time of the offense; JeB, aged seven at the time of the offense; and JaB, aged four at the time of the offense.[1]
On September 7, 2010, a criminal investigation was commenced. The investigation was triggered by JeB’s teacher’s re1 port of the bruise that she observed on his face when he came to school that day. According to the school’s principal, Korbin Johnson, the school’s counselor, called child protection to report the incident of suspected child neglect or abuse. Mr. Johnson confirmed that he had not observed any previous signs of abuse or suspected any prior abuse.
On September 9, 2010, Daniel Dooley, a forensic interviewer with the Children’s Advocacy Center of New Orleans, interviewed the three alleged victims. The interviews were videotaped. Recordings of the interviews, which Mr. Dooley identified, were played for the district court.[2]
After his forensic interview, JeB was seen by Dr. Jamie Jackson, a child abuse pediatrician with the Children’s Advocacy Center. The district court qualified Dr. Jamie Jackson as an expert in the fields of child abuse, neglect, and forensic pediatrics. Dr. Jamie Jackson conducted a physical exam and documented JeB’s injuries. She did not attempt to obtain a history from JeB since earlier that day he had undergone a forensic interview. She documented multiple curvilinear 1¡¡scars and abrasions on JeB’s underarms. She testified that these abrasions were the result of injuries inflicted within a few days to weeks' before her examination. She also observed subtle hyper-pigmented patterns (meaning they were darker than the rest of the skin) on JeB’s cheeks along with bruising, which were definite for impact with similarly patterned objects. She also noted subtle hyper-pigmented loop shaped marks over his chest and on his back, which were possibly caused by impact with similarly shaped objects. The marks she observed were highly suggestive of abuse even in the absence of a specific history. Dr. Jamie Jackson testified at length regarding the photographs taken of JeB during the examination.[3] Dr. Jackson explained that the patterned abrasions located on JeB’s back were consistent with abuse and with a history of being hit with a belt as punishment.
Dr. Amanda Jackson, the victims’ treating pediatrician, was qualified by the district court as an expert in the field of pediatrics. On September 28, 2010, Dr. Amanda Jackson examined all three victims at her office. She explained that after children are placed in foster care, they are routinely scheduled for an overall physical exam. The victims’ foster parent accompanied them to the visit, which was a well-care visit. While examining DM, Dr. Amanda Jackson observed several suspicious marks on his back. She asked him what the marks were from, and he responded that his aunt had whipped him with a belt. Dr. Amanda Jackson stated that the marks she observed were consistent with the history DM provided. | ¿He *3 also had several suspicious marks on his arms., DM explained that these marks were from his aunt grabbing him and leaving marks.
While examining JaB, who was four years old at the time, Dr. Amanda Jackson observed that he also had several of the same linear marks on his back and some curved marks. JaB explained that his aunt had whipped him with a belt.
JeB had lesions very similar to the other two victims. He had the same linear marks and the same semi-circular marks on his upper arms where he had been grabbed. The lesions were on the middle of the biceps and were consistent with having the arm grabbed and held very tightly with the nails digging into the skin. He reported that his aunt had hit him with a belt and had grabbed his arms.
The linear marks on the back of the victims were hyper-pigmented. These horseshoe shaped marks were consistent with a belt buckle having hit the skin. The location of the marks on the victims’ backs was consistent with abuse. Dr. Amanda Jackson testified that she never observed any signs of abuse- during the victims’ prior office visits.
Anne Troy testified that she is a full-time forensic nurse practitioner at the Audrey Hepburn Care Center at Children’s Hospital (the “Center”). The district court qualified her as an expert in child abuse pediatrics. On October 19, 2010, the victims were brought to the Center for forensic evaluations. Nurse Troy identified transcripts of her interviews with the victims, which were admitted into evidence.[4]
lsNurse Troy testified that, during her interview with DM, he related that Ms. Brown had hit him with a belt. JaB stated that Ms. Brown had hit him with a stick and a spoon. JaB mentioned that JeB’s lip had been cut when he was hit. He further mentioned that the incident occurred after JeB was incontinent and soiled the bed. Although JeB could not remember Ms. Brown hitting him, he stated that she whipped his brother, DM. JeB further stated that Eddie, Ms. Brown’s boyfriend, whipped him.
' Nurse Troy conducted the interviews of the victims separately. During the interviews, she took photographs of the areas suggesting abuse. At trial, she extensively reviewed the photographs.[5] Of particular concern to Nurse Troy were areas where hyper-pigmentation occurred. She explained that, because children heal quickly, the only remaining evidence of abuse will often be hyper-pigmented marks. Also of particular concern were patterned marks suggesting contact with similar shaped objects, especially when they are located along the spine and on the back as that is a common place where corporeal punishment is administered. Nurse Troy noted that she observed hyper-pigmentation with accompanying loop marks along JeB’s spine and down his back. She stated that these marks on JeB were similar to the marks she observed on both DM and JaB. She further stated that these marks were indicative of physical abuse as they were very suggestive of the end point of a belt buckle.
1 RNurse Troy discovered a blood blister on DB’s and JeB’s feet. The blood blisters were consistent with being beaten on their feet. Nurse Troy was very concerned about the blood blisters on the victims’ feet because it was the first time she had received a history of someone saying multi- *4 pie times that they had been hit on their feet.
Ms. Brown testified in her own defense. She explained that her sister, Betty Brown, died after giving birth to her seventh child. She further explained that after her sister’s death, four of her sister’s children came to live with her. Ms. Brown related the numerous difficulties she encountered in caring for the children in her one-bedroom house. She stated that all of the children were behind in school and were not well disciplined. Although Ms. Brown denied beating any of the children, she admitted that she may have “popped” them on the “butt” with a belt. She claimed that she kept her fingernails short. She denied grabbing any of the children by the arm and dragging them.

DISCUSSION

ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR

Ms. Brown’s sole assignment of error is that a verdict of attempted cruelty to a juvenile is not responsive to the charged offense of cruelty to a juvenile. Accordingly, she contends that her convictions must be reversed. For the reasons 17that follow, we find this assignment of error lacks merit and thus affirm her convictions.
La. R.S. 14:93 provides in pertinent part:
A. Cruelty to juveniles is:
(1) The intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child’s age shall not be a defense.
The commission of the crime of cruelty to a juvenile can be accomplished by either intentional or criminally negligent mistreatment or neglect. La. R.S. 14:27 provides in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
As indicated, an attempt to commit an offense requires specific intent to commit the crime as opposed to general criminal intent.
Ms. Brown’s argument that the verdict rendered is not responsive to the crime charged focuses on the theoretical nature of a responsive verdict. As Ms. Brown correctly points out, the responsive verdicts for La. R.S. 14:93 are not included in La.C.Cr.P. art. 814, the statute providing for “particular” responsive verdicts. Thus, the responsive verdicts for La. R.S. 14:93 are governed by La. C.Cr.P. art 815, which provides:
In all cases not provided for in Article 814, the following verdicts are responsive:
(1) Guilty;
h(2) Guilty of a lesser and included grade of the offense even though the offense charged is a felony, and the lesser offense a misdemeanor; or
(3) Not Guilty.
La. R.S. 14:27(C) provides:
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by *5 such person in pursuance of such attempt.
In arguing that attempted cruelty to a juvenile is not a responsive verdict, Ms. Brown relies on the oft-quoted clarifying definition of a lesser and included offense stated in State v. Poe, 214 La. 606, 38 So.2d 359, 363 (1948) (on reh’g):
In reaching the conclusion in the instant case that a verdict of simple assault is responsive to the charge of attempted, simple kidnapping, it was reasoned that ‘ * * * all that is required is that the greater offense must include all the elements of the lesser offense in order to make a verdict of the lesser offense responsive.’ We now find that this statement is not entirely accurate for, as we observed in the [State v] Roberts [213 La. 559, 35 So.2d 216 (1948)] case, the test is whether the definition of the greater offense necessarily includes all the elements of the lesser. Stated in another way for practical application, this merely means that, if any reasonable state of facts can be imagined wherein the greater offense is committed without perpetration of the lesser offense, a verdict for the lesser cannot be responsive.
Id. (emphasis in original).
Ms. Brown’s argument that attempted cruelty to a juvenile is not a responsive verdict stems from the principle that a “person cannot specifically intend to do something unintentionally.” State ex rel. Elaire v. Blackburn, 424 So.2d 246, 250 (La.1982) (discussing State v. Booker, 385 So.2d 1186 (La.1980)). The Third Circuit addressed the incongruity of- an attempt to commit cruelty to a juvenile through criminally negligent conduct in State v. Cortez, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515. In that case, the Third Circuit found that the defendant could not be convicted of attempted criminal negligence. Quoting Cortez, Ms. Brown contends that “a defendant who violates § 14:93 only through criminal negligence has not also perpetrated an attempt — a specific-intent crime — to commit cruelty to a juvenile because ‘a person cannot specifically intend to do something unintentionally.’”
In Cortez, unlike in this case, the principal issue was sufficiency of the evidence; indeed, Ms. Cortez did not suggest that attempted cruelty was not a responsive verdict. As the Third Circuit noted, “the judge instructed the jury on the charge of cruelty to a juvenile, as well as the responsive verdict of attempted cruelty to a juvenile. At no time did the defense object to the trial court’s charge to the jury.” Id., 96-859 at p. 6, 687 So.2d at 519. The Third Circuit thus assumed, for the sake of discussion, that the responsive verdict of attempted cruelty to a juvenile was a legislatively designated responsive verdict pursuant to La. R.S. 14:27.
In Cortez, the Third Circuit examined whether there was sufficient evidence presented at trial to find the defendant guilty of the greater offense of cruelty to a juvenile. After finding the evidence lacking, the Third Circuit turned to whether the evidence was sufficient to establish the offense of attempted cruelty to a juvenile. Concluding that Ms. Cortex could not be convicted of attempted cruelty to a juvenile for two reasons, the Third Circuit reasoned:
[T]he supreme court in Freeman held that “[t]he jury was properly charged with the lesser verdict of attempted cruelty to a juvenile,” because it was proven that the defendant had intentionally mistreated the child. Freeman, 409 So.2d at 587. We need not now discuss the correctness of the supreme court’s ruling in Freeman, or its applicability to *6 the case sub judice, as it is clearly distinguishable from the case at bar in one crucial aspect: No intent on the part of Ms. Cortez was proven by the state in the instant matter.
Based on our foregoing analysis, a conviction for attempted cruelty to a juvenile cannot stand for two reasons. First, the state has utterly failed to prove specific or general criminal intent on the part of Ms. Cortez necessary to sustain a conviction under the statute. A conviction based on attempted intentional mistreatment cannot stand absent a showing of general or'specific criminal intent. Second, it is a legal impossibility for someone to be guilty of attempted criminal negligence. As stated above, one cannot harbor the intent to do an unintentional act. For this court to hold otherwise would defy law and logic. Accordingly, Ms. Cortez could not be convicted of attempted criminal negligence.
Cortez, 96-859 at pp. 14-15, 687 So.2d at 524.
Unlike in Cortez, in this case, Ms. Brown does not suggest that the evidence was insufficient. Rather, she claims that her conviction should be reversed solely on the basis that, in theory, attempted cruelty to a juvenile can never be a responsive verdict to the completed offense.
Ms. Brown’s claim is deficient in three respects. First, she failed to preserve the assignment of error for appeal. Second, regardless of the definition of a lesser included offense on which she relies, attempted cruelty to a juvenile is a legislatively authorized lesser included offense by virtue of La. 14:27(C); therefore, it is a responsive verdict by virtue of La.C.Cr.P. art. 815. Third, the definition supplied in Poe is not universal; it fails to account for an exceedingly small subset of crimes such as cruelty to a juvenile. We separately address the procedural and substantive deficiencies in Ms. Brown’s claim.
Procedural deficiency — failure to object
Louisiana’s contemporaneous objection rule provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La. C.Cr.P. art. 841(A); State v. Knott, 05-2252, p. 2 (La.5/5/06), 928 So.2d 534, 535. The contemporaneous objection rule has two purposes: (1) to require counsel to call an error to the judge’s attention at a time when the judge |nmay correct the error; and (2) to prevent defense counsel from “sitting on” an error and gambling unsuccessfully on the verdict, and later resorting to appeal on an error that might have been corrected at trial. Id., 05-2252 at p. 2, 928 So.2d at 535; State v. Arvie, 505 So.2d 44, 47 (La.1987).
Although Ms. Brown does not complain that the evidence was insufficient to support the verdict, we note that in Blackburn, supra, the Louisiana Supreme Court held that a defendant must “make a contemporaneous objection to the instruction on responsive verdicts in order to complain on appeal of the insufficiency of evidence supporting the responsive verdict.” Blackburn, 424 So.2d at 251 (citing La. C.Cr.P. art. 814); see also State v. Williams, 99-1581, p. 10 (La.App. 4 Cir. 6/14/00), 766 So.2d 579, 584. Explaining the rationale behind this rule, the Supreme Court stated:
It would be unfair to permit the defendant to have the advantage of the possibility that a lesser “compromise” verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not *7 support the responsive verdict to which he failed to object.'
Blackburn, 424 So.2d at 251-52.
In response to Ms. Brown’s argument that attempted cruelty to a juvenile is not a legally cognizable responsive verdict, the State cites State v. Freeman, 409 So.2d 581 (La.1982), in which the Supreme Court upheld the verdict of attempted cruelty to a juvenile after the defendant claimed that no such verdict exists. Ms. Brown dismisses the significance of the Freeman case; her argument for doing so is as follows:
It cannot be determined from Freeman, however, whether the defendant ever objected to the district court having instructed the jury on attempted cruelty. If there had been no objection, then Freeman’s \ ^holding is merely consistent with the law generally allowing a defendant to waive a challenge to a non-responsive verdict in favor of allowing the jury to be instructed on a lesser verdict.
Despite recognizing the necessity of objecting to the responsiveness of the verdict of attempted cruelty to a juvenile, Ms. Brown nevertheless fails to suggest that she entered such an objection. Furthermore, the record does not reflect that she did so. Thus, she failed to preserve the claim for appellate review by entering a contemporaneous objection. Regardless, we find Ms. Brown’s claim lacks substantive merit.
Substantive deficiency — the merits
Recently, in State v. Barnett, 12-816 (La.App. 5 Cir. 5/16/13), 118 So.3d 1156, 2013 WL 2121928, the defendant raised a nearly identical theoretical argument on appeal after the responsive verdict of attempted aggravated assault with a dangerous weapon was rendered at his trial.[6] The defendant argued that the verdict was not legally responsive. He claimed that because an assault is merely an attempt to commit a battery, he could not be convicted of attempted aggravated assault with a dangerous weapon because the crime amounts to attempting to attempt to commit a crime. His argument was predicated on the incongruity of an attempt to commit the offense. The State countered that attempted aggravated assault with a firearm is a responsive verdict in cases in which the prosecution “does not rely on the attempted-battery definition of assault, but rather relies on the alternative theory or definition of assault, ie., the intentional placing of another in reasonable apprehension of receiving a battery.” Barnett, 118 So.3d at 1162.
Agreeing with the State, the Fifth Circuit in Barnett reasoned that a plain reading of the statute reveals that an assault is an attempt to commit a battery or the intentional placing of another in reasonable apprehension of receiving a battery. The Fifth Circuit found that it was evident from the record that the prosecution was founded on the defendant having intentionally placed another in reasonable apprehension of receiving a battery. Accordingly, the Fifth Circuit found that the responsive verdict of attempted aggravated assault with a firearm was appropriate. In so finding, the Fifth, Circuit reasoned that “the record supports a finding that the state’s theory of culpability rests on the alternative definition of assault and thus ... the responsive verdict of attempt *8 ed aggravated assault with a firearm is appropriate in this ease.” Barnett, 118 So.3d at 1164. Likewise, in this case, the prosecution alleged intentional mistreatment or neglect; and the responsive verdict of attempted cruelty to a juvenile was appropriate.
Summarizing, the jurisprudence has recognized that the definition of a lesser included offense stated in the Poe case, which Ms. Brown cites, does not account for those exceedingly few offenses — such as cruelty to juveniles and assault — that by statutory definition may be committed in more than one manner. Because Ms. Brown failed to- preserve her claim for appellate review and because her claim lacks substantive merit, we find this assignment of error lacks merit.

DECREE

For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED.

. In order to protect the identity of the minor victims, their initials are used in this opinion.

. The recordings are not part of the record on appeal.

. Copies of the photographs are not a part of the record on appeal.

. A copy of the transcripts of the interviews is not included in the record on appeal.

. The photographs are not included in the record on appeal.

. The arguments raised in this case and in the Barnett case, and their resolutions, are uniquely similar because just as cruelty to juvenile can be committed in either of two ways, so too can the offense of aggravated assault with a dangerous weapon. An assault is defined as either an attempt to commit a battery or the intentional placing of another in reasonable apprehension .of receiving a battery.